**CITY OF BURLINGTON, Appellee,**

v.

**CENTURY INDEMNITY CO., Appellant.**

**No. 354, Docket 24330.**

United States Court of Appeals
Second Circuit.

Argued April 11, 1957.

Decided June 6, 1957.

See also 15 F.R.D. 23.

Hilton A. Wick, Edmunds, Austin & Wick, Burlington, Vt., for Century Indemnity Co.

Bernard J. Leddy, Robert W. Eastman, Burlington, Vt., for City of Burlington.

Before HAND, MEDINA and WATERMAN, Circuit Judges.

HAND, Circuit Judge.

The defendant appeals from a judgment against it entered upon the verdict of a jury in an action upon a contract to execute a "performance bond." The jurisdiction of the district court depended upon diverse citizenship, the defendant being a Connecticut corporation and the plaintiff a city in Vermont. The only question which we find it necessary to consider is whether the judge should have granted the defendant's motion at the conclusion of the evidence to direct a verdict because the plaintiff had not proved any contract between the parties. The following is a statement of the evidence.

On September 21, 1951 the City entered into a contract with the Pierce Consulting Engineering Company (which we shall call the "Engineer"), to prepare and furnish engineering services and plans and specifications for an electrical generating station, which on April 8, 1952 was amended in matters not important to this controversy. On March 18, 1952, the "Engineer" contracted to furnish plans and specifications to the City for the construction of additional "distribution facilities." The City had a Board of Light Commissioners who were in general charge of the work, and in March they and Pierce, the chief officer and owner of "Engineer," negotiated regarding a performance bond that "Engineer" was to furnish for its execution of the contracts. In pursuance of this purpose Pierce approached a Boston insurance firm, known as Brewer and Lord, who were general agents of the defendant in Boston, and who turned over the proposal to Stockbridge, a representative of the defendant. Stockbridge took the matter up with the defendant's Hartford agent, Thompson, who was in charge of its bonding department; and in June Stockbridge asked Pierce for certain information that Thompson thought material to the decision. In replying Pierce sent to Stockbridge copies of the contracts, information about his own credit and a number of other matters, and a statement of the condition of two jobs as of June 10th. On June 25, 1952, Stockbridge forwarded all this to Thompson in Hartford, and on July 3rd Thompson answered, returning what Stockbridge had sent and enclosing a proposed performance bond, to be executed by "Engineer" and the defendant that bound them to the City for $200,000 as principal and surety, conditioned upon "Engineer's" furnishing the services required by the contract. This letter contained the following passage: "There are still several things we would like to have, namely a copy of the resolutions of September 10th, 1951, and an explanation of the debenture bonds payable in the amount of $44,600 shown in Pierce's statement of April 30, to whom these are payable and when? We note that Pierce has a bank overdraft of $6,866.00 and it would be interesting to know what credit arrangements Pierce has with the bank. Of course it would be very desirable to see personal statements of the indemnitor." Stockbridge wrote "Engineer" on July 8, enclosing the proposed performance bond, declaring that the defendant was "prepared to execute these Bonds* in your behalf," and stating what the premiums would be.

Shortly thereafter Pierce appeared before the City Board of Light Commissioners with Stockbridge's letter of July 8th and with some additional information, the contents of which are not very plain, but which, as he told the Board, was the best that he could get. He add-

* There was a second bond which does not enter into this controversy.

ed that he had done what he thought was necessary, and if they wanted to authorize further proceedings, it was at their expense. So far as appears, there for the time being the matter rested, until the City's Board of Aldermen met on July 16, before whom the Mayor, who had obtained Stockbridge's letter, brought up the matter. Rowley (an insurance agent in the City of Burlington, who was secretary and director of Hickok and Boardman, Inc., a general insurance agency in Burlington) was present at this meeting. He got a photostatic copy of the letter and the proposed bond and unsuccessfully tried to induce two other companies to issue a bond such as Stockbridge had proposed. About a month later Rowley called up the Hartford office of the defendant and asked to speak to Thompson, who was, however, on vacation. The operator then brought an unknown man to the telephone, who said that the defendant would "go along with the representative in Burlington, Hickok and Boardman, in the same manner that they would go along with their Boston agent." Armed with this, on August 18th Rowley wrote a letter to the Board of Aldermen, as president of the "Burlington City Association of Insurance Agents, Inc.," declaring that we "will be able to provide performance bonds" for "Engineer's" contracts: "these bonds to be executed with the Century Indemnity Company *in the same manner* and *on the same form* as mentioned in the enclosed photostatic copy of a letter originally dated July 8, 1952." He then went on to say that ordinarily "the prime contractor" [is] "to furnish Bond in the full amount of the contract"; but that as in this case "much of the contract work will be performed by several independent contractors" it would be "necessary to *acquire* a completion Bond from each sub-contractor" and he suggested that the City "require each of these sub-contractors to *furnish* a Bond." The Board referred this letter to the Electric Light Commission, which on the 21st voted that "no performance or completion bonds * * * seem

necessary nor justified, considering costs." In spite of this on the 25th the Board of Aldermen voted to instruct the Electric Light Commission to take out "performance bond on behalf of Pierce Consulting Engineering Co. * * * as recommended by the City Association of Insurance Agents in its communication dated August 18th." In obedience to this vote the Commissioners on the 29th wrote to the Burlington City Association of Insurance Agents to "place performance bonds on the Pierce Consulting Engineering Company in the amount of $200,000 * * * as per your letter dated August 18th, 1952 to the Board of Aldermen."

On the receipt of this letter Rowley spoke to Stockbridge on the telephone, asking him "to take the necessary procedure to get the bond issued." This talk was confirmed by a letter of Stuart, who like Rowley was an officer and employee of Hickok and Boardman, Inc. Part of this letter was as follows: "Pursuant to the recent telephone conversation between you and Mr. Rowley of this office and upon the authority of the Burlington Electric Light Commission, would you please complete the negotiations for the bonds with the Pierce Consulting Engineering Company, Inc., in the amount of $200,000. * * * These bonds are to be executed as of August 29th." Pierce wrote Stockbridge on the 23rd that Rowley had telephoned to ask "that we cooperate in obtaining a bond on the generating station. We understand the Burlington Agents are in the picture, and, in line with our endeavor to get the job done in Burlington, we are willing to cooperate with whatever insurance program is necessary." However, on the 29th Stockbridge had an interview with Pierce to which he brought "several copies of our financial statement blank and Contractor's Application Indemnity form," and at which he told Pierce that he "was there to get the necessary underwriting information towards completion of our negotiations." Pierce answered: "I don't believe that you would want to bond us now," and

he then showed Stockbridge several newspaper clippings which he suggested that Stockbridge should read. After Stockbridge had done so Pierce said: "Further than that * * * I am reaching financial difficulties," and he showed Stockbridge a further clipping of a suit that had been instituted, or was going to be instituted, against him. He concluded by saying: "On the strength of that I don't think you would want to write a bond for us." He never signed the application for the bond, nor the indemnity agreement that Stockbridge brought to him, nor did he furnish any of the information Stockbridge had asked for the preceding July.

It is irrelevant to a decision of the case whether a contract to which the principal is not a party is a contract of "suretyship." Perhaps it is more convenient and precise to confine that word to such occasions, and call contracts to which principal is not a party, "insurance," or "indemnity," contracts. There is not the slightest reason why the creditor and the obligor, call him what one will, may not make a contract which binds him to answer the default of an absent principal; indeed there is little difference in the resulting legal relations, for in either situation the obligor's rights against the principal arise not through the contract but by subrogation. All this is hornbook law which we will not amplify. The important consideration in the case at bar is whether the defendant had ever made a promise to execute a performance bond that was not conditional on "Engineer's" simultaneous execution as principal. It makes no difference whether we consider "Engineer's" participation in any agreement as a part of the consideration moving to the defendant or as a condition upon the defendant's performance. In either case "Engineer's" participation was indispensable; and we are at a loss to see how it can be supposed that this participation was not at least a condition precedent to the defendant's obligation to execute the bond as surety. What else could be meant by the phrase in Stockbridge's letter of July 8: "we understand you wish to submit to the City" the enclosed "copies of proposed Performance Bonds" for its "approval" which the defendant is "prepared to execute"? Again in Rowley's letter of August 18, which the City submits as the defendant's final offer, what conceivable meaning can be placed upon the stipulation that the bonds are to be executed "in the same manner and on the same form" as the letter of July 8th provided? What again did the language mean about the "prime contractor's" duty "to furnish" the performance bond, and about the sub-contractor's doing the same? Pierce never even orally agreed to sign the "bond application form" and the "indemnity agreement," or to furnish all the information that Stockbridge had asked for on July 8. The nearest he ever came to consenting to join in the bond was in his letter to Stockbridge of September 23 that he was "willing to cooperate with whatever insurance program is necessary." That consent, though we were to interpret it as agreeing to execute a performance bond as principal, was not the condition that the defendant had imposed upon its own promise. From the outset it had insisted, not upon his promising to join, but upon his joining, and it was free to impose any conditions it wished upon its obligation. Indeed, this would be true, though it could by legal sanctions have compelled him to join in the bond; it had not promised the City to do that; if he was to be compelled, the City must compel him and it never did. Whether in any event the defendant would not have been free to refuse to perform, after it learned of "Engineer's" changed financial condition on September 29, we need not decide.

The motion for a directed verdict should have been granted; the judgment is reversed, and the complaint will be dismissed.